IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| J.B.R., *a minor child, by and through his mother and legal guardian*, REBECCA RUPPE,<br><br>　　　　　　　　　Plaintiff,<br>　v.<br><br>RUSSEL CARLSON, *in his official capacity as Commissioner of the Georgia Department of Community Health*,<br><br>　　　　　　　　　Defendant. | CIVIL ACTION<br>FILE NO. |

## VERIFIED COMPLAINT

Pursuant to 42 U.S.C. §1983, Plaintiff J.B.R., by and through his mother and legal guardian, hereby files this Verified Complaint against Defendant Russel Carlson, in his official capacity as Commissioner of the Georgia Department of Community Health, for declaratory and injunctive relief to redress Defendant's violations of the Plaintiff's rights under the Medicaid Act, 42 U.S.C. §1396 *et. seq.*, and the Fourteenth Amendment.

1

## I.    INTRODUCTION

1.    This is an action to stop Defendant from reducing the private duty nursing services Plaintiff J.B.R. receives as a nine-year-old, Medicaid-eligible child under the Georgia Pediatric Program ("GAPP") to ameliorate his many complex conditions and maintain his health and wellbeing.

2.    Defendant Carlson administers GAPP under the Georgia Medicaid program to provide in-home private duty nursing services to medically complex Medicaid-eligible children and youth under the age of 21.

3.    Plaintiff currently receives 84 hours per week of private duty nursing services through GAPP.

4.    Plaintiff was informed by a letter that Defendant will reduce Plaintiff's private duty nursing hours to 56 hours per week beginning on October 2, 2023.

5.    The Early and Periodic Screening, Diagnostic, and Treatment Services ("EPSDT") provisions of the Medicaid Act require Defendant to provide Medicaid-eligible children with all necessary healthcare, diagnostic services, treatment, and other measures described in 42 U.S.C. §1396d(a) to "correct or ameliorate" a child's conditions. 42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4)(B), & 1396d(r)(5). This includes private duty nursing services. *See* 42 U.S.C.

§1396d(a)(8); *see also Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1224 (11th Cir. 2011).

6.     The Medicaid Act and the Fourteenth Amendment of the U.S. Constitution also require Defendant to provide Plaintiff with timely and adequate written notice when he is denying or reducing Medicaid services. 42 U.S.C. §1396a(a)(3); 42 C.F.R. §§431.206, 431.210; *Goldberg v. Kelly*, 397 U.S. 254 (1970). This written notice must include, among other requirements, a clear statement of what action the state intends to take and the specific reasons for the intended action including the legal and factual bases for the decision. 42 C.F.R. § 431.210(a)&(b); *Goldberg,* 397 U.S. at 267-68.

7.     Plaintiff, as a Georgia Medicaid recipient under the age of 21, is entitled to the prompt provision of EPSDT services, specifically medically necessary private duty nursing services, to ameliorate his complex conditions.

8.     Defendant fails to meet his obligations under the Medicaid Act and the Fourteenth Amendment by employing a flawed process to assess Plaintiff's conditions and care needs and authorize private duty nursing hours, specifically:

- Defendant disregards the role of Plaintiff's treating physician in determining what treatment is necessary to ameliorate Plaintiff's conditions;

3

- Defendant fails to apply EPSDT's "ameliorate" criterion of medical necessity to Plaintiff's requests for private duty nursing services;

- Instead, Defendant "scores" some of Plaintiff's skilled nursing tasks using a scoring tool created by the contractor that reviews requests for private duty nursing services under GAPP. The tool has not been subjected to  any scientific testing to demonstrate its accuracy, relevancy, or validity in determining the  amount of skilled nursing hours necessary to ameliorate the conditions of each individual GAPP participant;

- Defendant assumes J.B.R.'s parent caregivers are capable of substituting for the care of licensed nurses and, in performing J.B.R.'s care, are able to exercise the complex observations and critical decisions that require the knowledge and skills of a licensed nurse;

- Defendant assumes J.B.R.'s parent caregivers are capable of providing one hundred and twelve (112) hours per week of skilled care to him without any assessment of their availability (i.e., the need to sleep, work, or care for themselves, other children, or their household) or their physical or mental capacity to do so; and,

- Defendant's written notice of the reduction of Plaintiff's private duty

4

nursing services fails to provide Plaintiff notice of the specific factual and legal reasons for the reduction.

9.     Defendant's flawed process for authorizing private duty nursing services has resulted in Plaintiff being approved for an amount of private duty nursing services that is insufficient in "amount, duration, and scope to reasonably achieve" the ameliorative purpose of EPSDT.

10.     Defendant's flawed process has also left Plaintiff without a specific explanation of why his private duty nursing hours are being reduced.

11.     Defendant's unlawful acts and omissions have and will continue to irreparably harm Plaintiff by denying him medically necessary private duty nursing services to ameliorate his conditions and by denying him adequate written notice of Defendant's reasons for the decision to reduce Plaintiff's private duty nursing services.

12.     Plaintiff seeks declaratory and injunctive relief to promptly redress Defendant's violation of Plaintiff's rights under the Medicaid Act and the Fourteenth Amendment.

## II.     JURISDICTION AND VENUE

13.      This civil action is authorized by 42 U.S.C. § 1983 to redress the deprivation under color of law of rights guaranteed by the Medicaid Act and the

5

U.S. Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

14.   This Court has authority to grant Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

15.   Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b), since all of the acts and omissions giving rise to these claims occurred in the Northern District of Georgia.

### III.   PARTIES

16.   Plaintiff J.B.R. resides in Cumming, Georgia with his family. J.B.R. is a Georgia Medicaid beneficiary under the age of 21, and brings this action by and through Rebecca Ruppe, his mother and legal guardian.

17.   Defendant Russel Carlson is the Commissioner of the Georgia Department of Community Health ("DCH").  He is the chief administrative officer of DCH and supervises, directs, accounts for, organizes, plans, administers, and executes the functions vested in DCH. O.C.G.A. §§31-2-6; 49-4-144.  Defendant Carlson is responsible for ensuring that the administration and operation of the Georgia Medicaid Program, including GAPP, fully complies with federal and state laws including the Medicaid Act and its implementing regulations.  He is sued in

his official capacity for declaratory and injunctive relief. He was acting and continues to act under color of state law during the relevant acts and omissions alleged herein.

18. Defendants' business office is located at 2 Martin Luther King Jr. Drive SE, East Tower, Atlanta, GA 30334.

## IV. LEGAL FRAMEWORK

### The Medicaid Act

19. The Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5, establishes a medical assistance program cooperatively funded by the federal and state governments.

20. Medicaid is designed to "enabl[e] each State, as far as practicable...to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence and self-care...." 42 U.S.C. § 1396-1.

21. The Medicaid Act defines "medical assistance" as the categories of care and services listed at 42 U.S.C. §1396d(a) or the payment of part or all the cost of such care and services. 42 U.S.C. § 1396d(a).

22.     States are required to furnish medical assistance "with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

23.     States must provide for making medical assistance available to all individuals who are eligible. 42 U.S.C. § 1396a(a)(10)(A).

24.     A state's Medicaid program must "include reasonable standards. . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives" of the Medicaid Act. 42 U.S.C. § 1396a(a)(17).

25.     States are required to administer Medicaid in "the best interests of recipients." 42 U.S.C. § 1396a(a)(19).

26.     The Centers for Medicare & Medicaid Services (CMS) of the United States' Department of Health and Human Services administers Medicaid at the federal level. CMS's rules and regulations are set forth in 42 C.F.R. §§ 430.0-456.725 and in the CMS State Medicaid Manual.

27.     A state's participation in Medicaid is voluntary. Once a state elects to participate, it must adhere to the requirements established by the United States Constitution, the Medicaid Act, and the rules promulgated by CMS. 42 U.S.C. § 1396-1; 42 C.F.R. § 430.12.

28.     Defendants must "[f]urnish Medicaid promptly to beneficiaries

8

without any delay caused by the agency's administrative procedures," and must "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. §435.930(a)-(b).

29.    Defendants' Medicaid program must "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19); *see also* 42 C.F.R. § 435.902.

## The EPSDT Mandate

30.    The Medicaid Act requires state Medicaid programs to provide "early and periodic screening, diagnostic and treatment services" ("EPSDT") to Medicaid-eligible children under age 21. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), and 1396d(r).

31.    CMS describes EPSDT as follows:

The EPSDT benefit is more robust than the Medicaid benefit for adults and is designed to assure that children receive early detection and care, so that health problems are averted or diagnosed and treated as early as possible. The goal of EPSDT is to assure that individual children get the health care they need when they need it – the right care to the right child at the right time in the right setting.

9

U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs. (CMS), *EPSDT: A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* at 1 (June 2014) ("CMS EPSDT Guide").[1]

32.    Under the EPSDT provisions, Medicaid eligible children must receive all services and treatments covered by the Medicaid Act that are necessary to "correct or ameliorate" any physical and mental illnesses and conditions discovered during a screening by a healthcare clinician. 42 U.S.C. § 1396d(r)(5); *see also Moore*, 637 F.3d at 1235.

33.    Private duty nursing services are included in the treatments and services under the Medicaid Act. *See* 42 U.S.C. § 1396d(a)(8).

34.    The Medicaid Act defines private duty nursing services as "nursing services for beneficiaries who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility." 42 C.F.R. §440.80. These services are provided by "a registered nurse or a licensed practical nurse" and must be "[u]nder the direction of the beneficiary's physician." *Id*.

---

[1] The CMS EPSDT Guide can be accessed at:
https://www.medicaid.gov/sites/default/files/2019-12/epsdt_coverage_guide.pdf.

35.     A service will "correct or ameliorate" the child's condition if it corrects, compensates for, improves a condition, or prevents a condition from worsening, even if the condition cannot be prevented or cured. *CMS EPSDT Guide* at 10.

36.     CMS "defines ameliorative services as those 'that *maintain* or improve [a] child's current condition.' These services 'are covered when they *prevent a condition from worsening* or prevent development of additional health problems.'" *C.R. v. Noggle*, 559 F.Supp.3d 1323, 1336 (N.D. Ga. 2021) (quoting the *CMS EPSDT Guide* at 10) (emphasis in original).

37.     While states are "permitted (but not required) to set parameters that apply to the determination of medical necessity in individual cases…those parameters may not contradict or be more restrictive than the federal [EPSDT] statutory requirement." *CMS EPSDT Guide* at 23.

38.     For example, a state "may cover services in the most cost effective mode," but the state must ensure that "the less expensive service is *equally effective* and actually available." *Id.* at 25 (emphasis added).

39.     Furthermore, "a state may not deny medically necessary treatment to a child based on cost alone" and "[t]he child's quality of life must also be considered." *Id.*

40.     EPSDT defines the role of the treating physician as the "screening service" who takes "a comprehensive health and developmental history," performs "a comprehensive unclothed physical exam," and performs "laboratory tests" "to determine the existence of certain physical or mental illnesses or conditions." 42 U.S.C. § 1396d(r)(1)(A)&(B).

41.     EPSDT requires the provision of all necessary care "to correct or ameliorate" any conditions detected by the screening service. 42 U.S.C. § 1396d(r)(5).

42.     The amount of EPSDT services authorized by the state must be sufficient in amount, duration, and scope to reasonably achieve the purpose of the service to correct or ameliorate a child's condition. *See Moore*, 637 F.3d at 1257-8.

43.     The treating physician is "a key figure" and initially determines the amount of private duty nursing services necessary for the child. *Moore*, 637 F.3d at 1257.

44.     The state must consider and give weight to the opinions of a beneficiary's treating physician. Both the treating physician and the state have a role to play in evaluating whether a service is necessary to correct or ameliorate a child's condition. *Id.* at 24. The state cannot dismiss the treating physician's

recommendation without consideration and, where there is a disagreement, must decide, based on the evidence, whether the service should be covered. *Id.*

45.     The state is not the "final arbiter" of medical necessity and cannot ignore the treating physician's recommendation of nursing hours. *Moore*, at 1258-59.

46.     The Medicaid Act does not permit the state to delegate medically necessary private duty nursing services to unlicensed caregivers.

47.     Under EPSDT, the determination of the amount of private duty nursing services by licensed nurses necessary to correct or ameliorate a child's conditions is based upon the demonstrated healthcare needs of the child identified by the screening service (i.e., the treating physician).

48.     EPSDT does not authorize or permit the determination to be made based upon whether unskilled, unlicensed caregivers have been trained to provide certain nursing interventions.

**Due Process under the Fourteenth Amendment and the Medicaid Act**

49.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits Defendants from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, §1.

50.     Medicaid beneficiaries have a protectable "property interest" in their

13

Medicaid benefits under the Due Process Clause. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (holding when public welfare benefits are terminated, due process requires notice and an opportunity to be heard).

51.     The Due Process Clause requires Defendants to inform a Medicaid beneficiary of an adverse action by a "timely and adequate notice detailing the reasons for" a proposed action. *Id.* In order to be effective, such notice must include both the legal and factual bases underlying the decision. *See id.* at 268 (noting that "recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases").

52.     The Medicaid Act requires Defendants' Medicaid program to provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the [State] plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

53.     The federal regulations implementing 42 U.S.C. § 1396a(a)(3) specifically incorporate the due process standards of *Goldberg v. Kelly*, 397 U.S. 254 (1970). 42 C.F.R. § 431.205(d).

54.     The fair hearing regulations require Defendants to issue a written notice to every beneficiary whenever the agency takes any action affecting an

individual's eligibility, benefits, or services. 42 C.F.R. §§ 431.206(b) & (c)(2).

55.     Defendants "must provide all applicants and beneficiaries with timely and adequate written notice of any decision affecting their eligibility, including an approval, denial, termination or suspension of eligibility, or a denial or change in benefits and services." 42 C.F.R. § 435.917(a).

56.     The written notice must include (1) a statement of what action the state intends to take; (2) a clear statement of the specific reasons supporting the intended action; (3) the specific regulations that support, or the change in federal or state law that requires, the action; (4) an explanation of the individual's right to request an evidentiary hearing; and (5) an explanation of the circumstances under which Medicaid is continued if a hearing is requested. 42 C.F.R. § 431.210.

## V.     STATEMENT OF FACTS

### The Georgia Medicaid Program

57.     The State of Georgia participates in the Medicaid program.

58.     DCH is the single state agency responsible for administering the Georgia Medicaid Program and for complying with the Medicaid Act. See 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; O.C.G.A. § 49–4–142.

59.     To participate in the Medicaid program, a state must have a plan for medical assistance approved by Centers for Medicare and Medicaid Services

("CMS"). *See* 42 U.S.C. § 1396a(b).  DCH administers the Georgia Medicaid Program pursuant to the Georgia State Medicaid Plan (hereinafter "State Plan").

## The Georgia Pediatric Program

60.    DCH created GAPP as its service-delivery model under the Georgia Medicaid program for providing in home private duty nursing services to medically complex children under 21 years of age with multiple systems diagnoses.

61.    Defendant Carlson is responsible for the administration and operation of GAPP.

62.    Defendant Carlson is also responsible for ensuring that the administrative methods that DCH employs to operate GAPP comply with applicable federal laws including the Medicaid Act and the U.S. Constitution.

63.    Defendant Carlson likewise is responsible for implementing DCH's fair hearing process; and as such is responsible for ensuring that GAPP participants receive timely and adequate written notice when GAPP services are denied, terminated or reduced.

64.    Defendant issues, and updates quarterly, a policy manual entitled "Part II Policies and Procedures for Georgia Pediatric Program Services (GAPP)

In-Home Nursing" (hereinafter "GAPP Manual"), that governs the administration of GAPP. The current GAPP Manual is dated October 1, 2023.

65. From its inception in 2002, GAPP has been a "teach and wean" program, meaning that caregivers are taught to perform the skilled nursing tasks needed by their child and then the number of nursing hours approved for a GAPP participant are subsequently weaned down over time, with the caregiver expected to provide the requisite hours of nursing care that have been reduced without regard for the child's actual nursing needs.

66. When a child enters GAPP, an initial number of skilled nursing hours to be authorized is established for the child, and then the authorized nursing hours are reduced over a period of time as the caregiver is presumed to be sufficiently trained in the performance of certain skilled nursing interventions.

67. Even though DCH has removed the express "teach and wean" language from the GAPP manual, GAPP remains a "teach and wean" program in practice. The longer a child participates in GAPP, the likelihood increases that the number of private duty nursing hours will be weaned as a parent is taught to perform certain skilled nursing tasks for their child.

68. Some of the factors considered in determining whether to wean nursing hours are how long the participant has been in GAPP and whether the

participant has been medically stable, i.e., exhibits no new skilled care needs or no recent hospitalizations.

69.     Reductions of skilled nursing hours under the "teach and wean" policy are made without any consideration of the caregiver's capacity to provide care.

70.     In determining the number of nursing hours to be authorized for a GAPP participant, GAPP policy does not permit the consideration of "social factors" that may limit a caregiver's ability to provide care for a GAPP participant, such as employment, other children or dependents to care for, functional limitations or physical impairments, sleep, maintaining a household, etc.

71.     GAPP assumes the delegation of skilled nursing tasks to parents is appropriate once a parent has been taught by the child's nursing agency to perform the skilled nursing tasks in the child's plan of care.

72.     GAPP policy does not permit an increase in authorized nursing hours unless a new skilled nursing intervention is demonstrated.

73.     DCH has delegated the task of reviewing and deciding whether to approve or deny all requests for private duty nursing services under GAPP to a contractor, Alliant Health Solutions, Inc. ("Alliant").

74.     Alliant applies the policies and procedures of the GAPP Manual when it reviews requests for prior authorization for private duty nursing services.

75.    The GAPP Manual specifies the information and documentation that must be submitted in support of a request for private duty nursing services.

76.    The child's GAPP nursing provider collects and submits the required information and documentation which includes a request for a specific number of nursing hours per week recommended by a treating physician.

77.    Alliant employs a "medical review team" to review requests for nursing services under GAPP. The team usually consists of two or three nurses and one or two physicians who meet to review requests for nursing services. Only one of the physicians attends a team meeting.

78.    An initial review of the GAPP packet submitted by the child's nursing agency is conducted by a review nurse. Typically, the review nurse is the only team member to review the treating physician's recommendation and other medical records.

79.    The review nurse uses a scoring tool called the "Georgia Pediatric Program (GAPP) Evaluation Score Guidelines" (hereinafter "GAPP Score Guidelines") to determine the amount of skilled nursing hours to be authorized for each child reviewed.

80.    The GAPP Score Guidelines were created by Alliant. They have never been subjected to any scientific review to determine their accuracy, reliability, or

validity as a tool to measure or determine the amount of skilled nursing services to ameliorate the multiple conditions of medically complex children who participate in GAPP.

81.    The GAPP Score Guidelines form is primarily comprised of a list of various skilled nursing interventions. Each skilled nursing intervention listed has a point value assigned to it.

82.    The GAPP Score Guidelines form contains a small box for entry of a primary diagnosis. There is no space on the form for other diagnoses.

83.    The review nurse identifies skilled nursing interventions for the child being reviewed and places a check by a box corresponding to the skilled nursing intervention.

84.    Once the review nurse has finished scoring the child's skilled nursing interventions, the points for each of the checked boxes are totaled.

85.    The review nurse then applies the Scoring Guidelines listed on the form to the total number of points to determine the range of nursing hours to be authorized. Upon information and belief, the following are the Scoring Guidelines used by Alliant:

- 1-6 points: Individual consideration

- 7-12 points: 2-8 hours/day, 14-56 hours/week

- 13-18 points: 6-12 hours/day, 42-84 hours/week

- >19 points: Individual consideration

86. From within the range of nursing hours indicated by the score, the review nurse then decides on the number of nursing hours to be recommended to the GAPP "medical review team."

87. The treating physician's recommendation of nursing hours is not included on the GAPP Score Guidelines form.

88. The number of hours recommended by the review nurse is also not included on the GAPP Score Guidelines form.

89. The review nurse then meets with the GAPP "medical review team" comprised of a physician and one or two additional nurses, and provides the team with an oral summary of the GAPP Score Guidelines for the child and provides a recommendation of the number of private duty nursing hours for the child.

90. The GAPP "medical review team" members are not provided a copy of, and do not review, the packet of medical information submitted by the child's nursing agency or a copy of the GAPP Score Guidelines prepared by the review nurse.

91. The sole physician participating in the "medical review team" meeting normally participates by telephone.

92.     The GAPP "medical review team" discusses the reviewing nurse's verbal summary of the GAPP Score Guidelines and the recommended number of nursing hours and then determines the number of nursing hours to be authorized under GAPP.

93.     The GAPP "medical review team" typically adopts the recommendation of the review nurse as the nursing hours medically necessary for the GAPP participant.

94.     The review nurse then prepares and uploads text regarding the decision of the "medical review team" which is inserted into a template notice letter that is sent to the child's parents.

95.     The notice letters produced by Alliant do not state the specific reasons for the decision of the "medical review team" and do not address or respond to the treating physician's recommendation.

96.     Alliant's process for determining the number of hours of nursing to be authorized for children who participate in GAPP is not based upon, nor does it apply, the ameliorate criterion required by EPSDT.

97.     Alliant medical review team members review requests for skilled nursing services with the assumption that all caregivers are capable of being

22

trained to perform all skilled nursing tasks, except for a skilled nursing head-to-toe assessment.

### J.B.R.'s Condition and Care Needs

98.    J.B.R. has many serious, chronic conditions, including tuberous sclerosis, intractable focal epilepsy, autism spectrum disorder, developmental delay, insomnia, dysphagia, GERD, mild dairy allergy, mild persistent asthma, obstructive sleep apnea, small cardiac rhabdomyoma, and bilateral cystic kidney disease.

99.    He was diagnosed at birth with tuberous sclerosis, a rare genetic disease that causes noncancerous tumors (potato-shaped nodules referred to as tubers) to grow throughout the body. He has multiple tumors on his brain, and tumors are also present on his lungs and kidneys. He has had several surgeries – tuberectomies – to remove tubers. His tuberous sclerosis causes multisystem complications.

100.    He is legally blind, incontinent, and nonverbal.

101.    His multiple conditions require around-the-clock care, and he is completely dependent upon his caregivers for all of his needs.  His conditions require the care of several sub-specialist physicians.

102.    The tubers on J.B.R.'s brain cause intractable focal epilepsy. For J.B.R., the intractable seizures impact his daily life and require around-the-clock supervision, emergent intervention, and daily medications.

103.    His seizures occur randomly. He can have more than 10 seizures in a day, with as many as 3 or more occurring in clusters. These clusters can last a few seconds to several minutes.

104.    He has had multiple brain surgeries to remove the tubers. He has also had a medical device called a vagal nerve stimulator implanted in his brain to help minimize the seizure activity. Despite these interventions, J.B.R. continues to have daily seizures.

105.    J.B.R. must be continually monitored and observed for seizure activity.

106.    He receives four (4) seizure medications twice a day and one (1) seizure medication once per day to reduce his seizures. He also is administered five (5) "rescue meds" including Diastat, clonazepam, and Ativan as needed for prolonged seizures or a cluster of seizures.

107.    His respiratory status must be closely monitored while he is having seizures to maintain his airway and assess for respiratory distress or aspiration.  He

is at particularly high risk of aspiration during a seizure, which could lead to respiratory distress and pneumonia.

108.   He must have a skilled caregiver who can identify when he is having a seizure and can intervene appropriately as necessary.

109.   J.B.R. has reactive airway disease, asthma, and impaired airway clearance. He has a history of pneumonia.

110.   He receives daily respiratory interventions to maintain his respiratory status and ensure his lungs remain clear. He is administered medications via a nebulizer, which converts the liquid medication into a mist to be inhaled, twice per day. He requires daily respiratory interventions including chest physiotherapy (CPT) vest 1-2 times per day which assists with breaking up secretions in his lungs.

111.   In addition to these daily respiratory treatments, he receives treatments on an as needed basis, including Albuterol administered via nebulizer for wheezing or labored breathing. He also has a cough assist machine to help trigger a cough to bring up mucus. When he is sick, he has a pulmonary treatment plan in which he receives an increased regimen of nebulized medications throughout the day, CPT vest treatments 4 times per day, and high-flow oxygen.

112.   J.B.R. requires supplemental oxygen as needed for desaturations associated with seizure activity. He is administered oxygen if his seizure lasts longer than three minutes. Supplemental oxygen is also used anytime he is sick or his oxygen saturation is low.

113.   His oxygen saturation levels must be regularly monitored. It is difficult to monitor his oxygen saturation levels with a pulse oximeter because he has sensory issues due to his autism and doesn't like having things on him.

114.   J.B.R. has oropharyngeal dysphagia, or difficulty swallowing, and is unable to protect his airway when swallowing. He is at risk of aspirating fluids. His oral secretions need to be monitored and suctioned as needed.

115.   He receives all his nutrition and medications via gastrostomy tube (G-tube) which is a tube inserted through the abdomen that delivers the nutrition and medication directly into the stomach.

116.   He has thirteen (13) feedings throughout the day from 8:00 a.m. to 8:00 p.m. He must be observed during the feeding to ensure he is tolerating it and to prevent aspiration. Prior to each feeding, J.B.R.'s nurses must assess for gastric residuals in his stomach to determine whether to proceed with the feeding. The G-tube must be properly flushed after the administration of his medications.

117. The G-tube also needs to be constantly assessed. It must be checked for placement with each use. The G-tube site must be kept clean and the site must be constantly inspected for signs or symptoms of irritation or infection.

118. J.B.R. is currently administered a daily regimen of multiple physician-ordered medications, some of which are administered as needed or "PRN" according to the judgment of his nurses.

119. J.B.R.'s tuberous sclerosis also affects his cardiac system and can cause irregular heartbeats and structural damage to the heart. This has caused him to experience symptoms of low heart rate and irregular heartbeats which can cause dizziness and makes him at risk for falls. He has required heart monitoring with a holter monitor in the past and procedures to ensure he does not require surgical or medical interventions.

120. J.B.R. has a port-a-cath placed under his skin and used for vascular access. It is used to draw blood for labs.

121. The area where the port-a-cath is placed requires regular monitoring and sterilization to minimize risk of infections or other complications. The port-a-cath requires monthly flushes. J.B.R. is administered Versed to calm him prior to the flushing.

122.   J.B.R. is diagnosed with autism spectrum disorder and developmental delay. He experiences deficits in numerous areas of adaptive functioning which negatively impact his ability to comprehend and carry out activities of daily living to successful completion.

123.   Because of his deficits in verbal communication, he requires support with personal hygiene, bathing, grooming, and dressing. He also experiences episodes of self-injurious behavior such as biting himself or others. He can also become aggressive to the point of hurting himself or others.

124.   Sometimes an extra set of hands is needed to hold him down to administer medications. He also has sensory issues related to his autism and does not like having things touching him which makes administering oxygen and monitoring his oxygen saturation with a pulse oximeter challenging for his nurses.

125.   His mother is trained in many aspects of his care, but she is not a trained and licensed nurse. She cannot provide J.B.R. with the complex observation and critical decision-making of a licensed nurse.

126.   J.B.R.'s care is continuous and demanding.  He cannot be left alone and requires the constant presence of a caregiver capable of responding to his complex needs.

28

**J.B.R.'s Request for Private Duty Nursing Services**

127.   J.B.R. currently receives 84 hours per week of Medicaid-funded private duty nursing services through GAPP as recommended by his treating physicians to ameliorate his conditions.

128.   J.B.R. was due for a reauthorization of his nursing services beginning in July 2023. In May of 2023, J.B.R.'s nursing provider, Bayada Home Health, submitted documentation supporting a request for the continuation of 84 hours per week of private duty nursing services. Amongst the documentation submitted by Bayada was a letter of medical necessity dated May 19, 2023, from J.B.R.'s treating pediatrician, Dr. LaRue D. Penny, Jr. Dr. Penny's letter described J.B.R.'s medically complex conditions and his many skilled care needs. Dr. Penny recommended J.B.R. receive 84 hours per week of private duty nursing services to ameliorate his complex conditions.

129.   Also submitted with the documentation was a letter of medical necessity dated May 22, 2023, from Dr. Margaux Charbonnet of the Medically Complex Care Clinic at Children's Healthcare of Atlanta. Dr. Charbonnet's letter also described J.B.R.'s medically complex conditions and his many skilled care needs. Dr. Charbonnet also recommended J.B.R. receive 84 hours per week of private duty nursing services to ameliorate his complex conditions.

130. On June 23, 2023, Bayada received a letter of notification from Alliant via the web portal maintained by DCH notifying them that J.B.R. had been approved for 56 hours per week of private duty nursing services and 28 hours per week of personal supports effective from July 1, 2023 to December 31, 2023.

131. Bayada notified Mrs. Ruppe of Alliant's decision to reduce J.B.R.'s nursing hours.

132. Mrs. Ruppe requested reconsideration of the reduction of J.B.R.'s nursing hours.

133. Mrs. Ruppe did not receive written notification of the reduction in J.B.R.'s nursing hours from Alliant until July 3, 2023. The letter was dated June 27, 2023.

134. The Alliant Notice letter stated the following:

[J.B.R.] has been awarded 56 hours/week of skilled nursing services and 28 hours/week of personal care support services. Hours are awarded based upon the current medically necessary needs as documented within the GAPP packet for the review period submitted by BAYADA HOME CARE. [J.B.R.] requires respiratory interventions, seizure monitoring, GTube feedings and medication administration. [J.B.R.] also requires assistance with activities of daily living, such as bathing, dressing, grooming, and transferring. The hours awarded should meet his current needs.

135. While Alliant reconsidered J.B.R.'s request for skilled nursing hours, Alliant issued an amended letter of notification through the web portal notifying

Bayada that J.B.R. was authorized to receive 84 hours per week of skilled nursing until July 31, 2023. Thereafter, the reduction to 56 hours per week of skilled nursing would commence.

136. On August 21, 2023, Bayada notified Mrs. Ruppe that Alliant had issued a letter of notification maintaining the reduction of 56 hours per week of skilled nursing with the reduction commencing on October 2, 2023.

137. On August 25, 2023, Mrs. Ruppe received a notice letter from Alliant dated August 18, 2023, which stated the following:

> [J.B.R.] has been awarded 56 hours/week of skilled nursing services and 28 hours/week of personal care support services. Hours are awarded based upon the current medically necessary needs as documented within the GAPP packet for the review period submitted by BAYADA HOME CARE. The documentation submitted for review indicates [J.B.R.] CPT, VNS use, GTube feedings and medication administration. No new medically necessary needs were noted in the documentation submitted. [J.B.R.] also requires assistance with activities of daily living, such as bathing, dressing, grooming, and transferring. The hours awarded should meet his current needs.

138. The Alliant notice letter fails to provide sufficient notice to J.B.R. The letter does not provide any reasons for the reduction in J.B.R.'s nursing hours. It fails to articulate why or how Alliant determined that 56 hours per week was sufficient to ameliorate J.B.R.'s complex conditions. It is also completely

31

unresponsive to the recommendations of J.B.R.'s treating physicians for the 84 hours per week of private duty nursing services they requested.

139.  Defendant's failure to provide private duty nursing services as prescribed by J.B.R.'s treating physicians places him at risk of harm to his health and wellbeing.

## VI.   CAUSES OF ACTION

## COUNT I

## Violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act

140.   Plaintiff incorporates and re-alleges paragraphs 1 through 139 as if fully set forth herein.

141.   Defendant's application of GAPP policies and practices to Plaintiff's request for private duty nursing services to ameliorate his complex conditions is arbitrary, capricious, and unreasonable and has denied Plaintiff his right to be provided medical assistance under EPSDT for which he is eligible in violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act.

142.   Defendant's acts and omissions have denied Plaintiff his right to be furnished the EPSDT services to which he entitled in violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act.

143.   Defendant's conduct is continuous and ongoing in violation of the Medicaid Act.

144.   Defendant has violated the Plaintiff's clearly established rights under 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A), which rights are enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

145.   Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of necessary Medicaid services.

146.   Defendant's conduct, unless enjoined, will continue to inflict injuries on Plaintiff for which he has no adequate remedy at law.

## COUNT II

### Violations of the EPSDT provisions of the Medicaid Act

147.   Plaintiff incorporates and re-alleges paragraphs 1 through 139 as if fully set forth herein.

148.   In violation of the EPSDT provisions of the Medicaid Act, Defendant failed to decide Plaintiff's request for private duty nursing services in accordance with the "correct or ameliorate" standard and to provide Plaintiff with private duty nursing services in sufficient amount, duration, scope to achieve the ameliorative purpose of EPSDT in violations of 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act;

33

149.   Defendant's application of GAPP policies and practices to Plaintiff's request for private duty nursing services to ameliorate his complex conditions is arbitrary, capricious, and unreasonable and has denied Plaintiff his right to be provided medical assistance under EPSDT to which he is entitled in violation of 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act.

150.   Defendant's conduct is continuous and ongoing in violation of the Medicaid Act.

151.   Defendant has violated the Plaintiff's clearly established rights under 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5), which rights are enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

152.   Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of necessary Medicaid services.

153.   Defendant's conduct, unless enjoined, will continue to inflict injuries on Plaintiff for which he has no adequate remedy at law.

## COUNT III

### Violations of 42 U.S.C. § 1396a(a)(3) of the Medicaid Act

154.   Plaintiff incorporates and re-alleges paragraphs 1through 139 as if fully set forth herein.

155.   Defendant's written notice fails to provide a clear statement of the specific reasons supporting Defendant's reduction of Plaintiff's private duty nursing services under GAPP in violation of the 42 U.S.C. § 1396a(a)(3) and 42 C.F.R. §§ 431.206 & 431.210.

156.   Defendant's conduct is continuous and ongoing in violation of the Medicaid Act.

157.   Defendant has violated the Plaintiff's clearly established right under 42 U.S.C. § 196a(a)(3), which rights are enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

158.   Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of his statutory right to timely and adequate notice of Defendant's decision regarding Plaintiff's request for private duty nursing services.

159.   Defendant's conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

## COUNT IV

### Violation of the Fourteenth Amendment to the U.S. Constitution

160.   Plaintiff incorporates and re-alleges paragraphs 1 through 139 as if fully set forth herein.

161.   Defendant's written notice fails to provide a clear statement of the

legal and factual bases supporting Defendant's reduction of Plaintiff's private duty nursing services under GAPP in violation of Due Process Clause of the Fourteenth Amendment.

162.  Defendant failed to provide Plaintiff with timely and adequate written notice of his decision to reduce Plaintiff's private duty nursing services in violation of the Due Process Clause of the Fourteenth Amendment.

163.  Defendant's conduct is continuous and ongoing in violation of the Due Process Clause of the Fourteenth Amendment.

164.  Defendant has violated the Plaintiff's clearly established right to due process under the Due Process Clause of the Fourteenth Amendment, which right is enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

165.  Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of his constitutional right to due process of law including timely and adequate written notice.

166.  Defendant's conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Assume jurisdiction of this matter;

(b)    Declare Defendant's review process for determining the amount of private duty nursing services to be authorized for Plaintiff minimizes the skilled care needs identified by Plaintiff's treating physicians and arbitrarily ignores the treating physicians' determination of the amount of private duty nursing services necessary to ameliorate Plaintiff's conditions in violation of 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act;

(c)    Declare the Medicaid Act requires private duty nursing services be provided by licensed nurses and does not provide for the delegation of skilled nursing task that require the knowledge and skill of a licensed nurse to a family caregiver;

(d)    Declare that the determination of whether private duty nursing services are medically necessary for Plaintiff under the Medicaid Act must be based upon whether the services are necessary to correct or ameliorate Plaintiff's conditions, not on whether a family caregiver is trained to perform skilled nursing tasks for the Plaintiff;

(e)    Declare that Defendant's imposition of the "teach and wean" policy under which family caregivers are taught to perform skilled nursing tasks for the Plaintiff and the Plaintiff is then weaned from private duty nursing services violates Defendant's duty under 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and

1396d(r)(5) of the Medicaid Act to provide all necessary private duty nursing services to correct or ameliorate the Plaintiff's conditions;

(f)    Declare that Defendant's "teach and wean" policy requiring family caregivers to provide a portion of Plaintiff's medically necessary skilled care deprives Plaintiff of his entitlement to all necessary private duty nursing services to correct or ameliorate his conditions in violation of a violation of 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act;

(g)    Declare that Defendant's application of GAPP policies and practices to Plaintiff's request for private duty nursing services has denied, and continues to deny, Plaintiff the medical assistance for which he is eligible under the Medicaid Act in violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act;

(h)    Declare Defendant's failure to provide timely and adequate written notice of his decision to reduce Plaintiff's private duty nursing services a violation of the Due Process Clause of the Fourteenth Amendment and of 42 U.S.C. § 1396a(a)(3) of the Medicaid Act;

(i)    Issue preliminary and permanent injunctive relief enjoining Defendant from the following:

1) Enjoin Defendant from denying Plaintiff 84 hour per week of private duty nursing services;

38

2) Enjoin Defendant from failing to consider the recommendations of Plaintiff's treating physicians for private duty nursing services;

3) Enjoin Defendant from applying criteria other than the correct or ameliorate criteria required by EPSDT to Plaintiff's requests for private duty nursing services;

4) Enjoin Defendant from applying policies to Plaintiff that require his family caregivers to provide daily skilled nursing care necessary to correct or ameliorate his conditions;

5) Enjoin Defendant from providing Plaintiff with written notice of his decisions regarding private duty nursing services that fail to provide a clear statement of the specific reasons for Defendant's decisions including a specific explanation why the amount of private duty nursing services requested by the treating physician are not necessary to correct or ameliorate his conditions;

(j) Enter judgment in favor of the Plaintiff;

(k) Award Plaintiff the costs of this lawsuit and reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988; and

(l) Order such other and further relief as this Court may deem equitable and just.

Dated: October 3, 2023.

s/ Joshua H. Norris
Joshua H. Norris
Georgia Bar No. 545854
**LAW OFFICE OF JOSHUA H. NORRIS, LLC**
One West Court Square, Suite 750
Decatur, GA  30030
Telephone:  (404) 867-6188
Facsimile:  (404) 393-9680
E-mail:      josh.norris@childrenshealthlaw.org

and

John H. Fleming
Georgia Bar No. 263250
Anna C. Halsey
Georgia Bar No. 208034
Alla Raykin
Georgia Bar No. 291506
**EVERSHEDS SUTHERLAND (US) LLP**
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia  30309-3996
Telephone:  (404) 853-8000
Facsimile:  (404) 853-8806
E-mail: JohnFleming@Eversheds-Sutherland.com
    AnnaHalsey@Eversheds-Sutherland.com
    AllaRaykin@Eversheds-Sutherland.com

*Attorneys for Plaintiff*

## VERIFICATION

STATE OF GEORGIA      §
                             §

COUNTY OF FULTON     §

My name is Rebecca Ruppe. I am the mother and legal guardian of J.B.R. I have read the Verified Complaint for Injunctive and Declaratory Relief. The allegations of which I have personal knowledge stated in the Verified Complaint are true and correct. The allegations of which I do not have personal knowledge I believe to be true based on specified information, documents, or both.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of October, 2023.

_____
REBECCA RUPPE